**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-28-20-APM** |
| **MICHAEL GREENE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On January 6, 2021, Defendant Michael Greene led members and affiliates of the Oath Keepers who breached the United States Capitol to stop Congress from certifying the 2020 presidential election.   For his role in this unprecedented attack on the peaceful transfer of power, Greene deserves the maximum sentence permitted by statute: one year of incarceration.

## I.   BACKGROUND

The defendant was the "operations leader" for the Oath Keepers on January 6, 2021.   That day, he was the first known member of the group to breach the restricted area of the Capitol grounds.   As the riot unfolded, the defendant called those under his command to the Capitol:



1

Government's Exhibit 1500.4.

Dozens of Oath Keepers answered Greene's order and huddled at the Capitol.   At about 2:35 p.m., Greene and Oath Keepers leader Elmer Stewart Rhodes III ended a call with Florida leader Kelly Meggs.   Immediately thereafter, Meggs and thirteen other Oath Keepers members and affiliates—many of whom were wearing paramilitary clothing and patches with the Oath Keepers name, logo, and insignia—marched toward the doors of the Capitol, hands on shoulder, in a coordinated and calculated fashion:



Government's Exhibit 1050.1.   The group breached the Capitol through the east Rotunda doors minutes later.

At about 3:08 p.m., Greene ended a call with Alabama Oath Keepers leader Joshua James. Immediately thereafter, James led a second wave of five battle-clad Oath Keepers up the same

steps, through the same doors, and into the Capitol.   Greene sent a message to an acquaintance, bragging, "Were storming the Capitol," and, the moment the second group breached, Greene photographed the doors.

The Oath Keepers' participation in the attack on the Capitol was the culmination of weeks, if not months of plotting by Rhodes to oppose by force the lawful transfer of power from President Donald J. Trump to President-Elect Joseph R. Biden, Jr.   Greene was one of Rhodes' top deputies for most of that period.   He was privy to Rhodes' goals and plans, and he agreed to serve as the leader of Rhodes' operation for January 6.

**A.  Summary of Evidence**

The evidence presented at Greene's trial established that he participated in a conspiracy with Rhodes and other Oath Keepers members and affiliates to prevent, hinder, or delay Congress' certification of the 2020 election, and to use force, intimidation, or threats to prevent members of Congress from discharging their duties during that proceeding.   Then, on the afternoon of January 6, he summoned his co-conspirators to the Capitol and greenlighted their participation in the attack.

*i.  The Plot to Oppose by Force the Lawful Transfer of Power*

In the days and weeks after the election, the leaders of the Oath Keepers—to include Stewart Rhodes and Kelly Meggs, the leader of the Florida chapter—repeatedly told their followers that the time for peaceful opposition had come to an end.   Two days after the election, Rhodes pledged, "We aren't getting through this without a civil war.   Too late for that.   Prepare your mind, body, spirit."   Gov. Ex. 9726 (Msg. 1.S.696.12491).   Rhodes' calls for resistance and violence only escalated in the weeks that followed.   On December 31, 2020, Rhodes wrote, "On the 6th, they are going to put the final nail in the coffin of this Republic, unless we fight our way out.   With Trump (preferably) or without him, we have no choice.".   Gov. Ex. 9726 (Msg.

1.S.696.17678).   On December 22, Kelly Meggs similarly messaged the OKFL Hangout Signal group, "It's easy to chat here.   The real question is who's willing to DIE, that's what the Patriots did by the thousands.   We are worried about getting the day off."   Gov. Ex. 9728 (Msg. 1.S.656.9322).

These beliefs were shared and echoed by the defendant and his co-conspirators.   On November 25, 2020, Greene wrote to another Oath Keeper, "Stewart believes were on the brink of a Civil War," and stated, "I can see how it would happen," as "a lot of people are upset about this election."   Gov. Ex. 9732 (Msgs. 53.T.2.37-40); *see also* Gov. Opp. Def. Mot. Judg. Acquittal, ECF No. 950 at 5-7.

Greene was a trusted top lieutenant to Rhodes, one whom Rhodes appointed to lead Oath Keepers operations.   *See, e.g.*, Gov. Ex. 9725 (Msg. 1.S.159.83) ("I'm putting Don Siekerman in overall command of this op.     And then Whip, Josh and Kelly as his seconds because they have been to DC prior.").   Greene, for example, participated in the November 14 and December 12 Oath Keeper operations in D.C.   3/7/23AM Tr. at 6093-6101.

A critical component of the Oath Keepers' preparation for January 6 was to have an organized quick reaction force ("QRF"), comprised of individuals positioned with a cache of weapons, who could be summoned into the city if ordered by Rhodes.   *See, e.g.*, Gov. Ex. 9750. The weapons were primarily stored at a Comfort Inn in Ballston, Virginia.   02/15/2023PM Tr. at 2419.   Several of the defendants contributed to this effort by traveling to D.C. with weapons and staying at the same hotel as members of the quick reaction force.

Greene was privy to the planning for QRF.   He was a member of the "DC OP: Jan 6 21" group chat on which Rhodes, Kelly Meggs, and Paul Stamey updated other leaders about certain QRF logistics.   Gov. Ex. 10252 at 2-6.   Forensic data from Greene's phone suggest these

messages were read.  *Id.*  And on January 5, Meggs direct messaged Greene, "We are heading in just unloaded at QRF."  Gov. Ex. 10061.  Greene also brought weapons to D.C. for the January 6 operation.  See 3/7/23PM Tr. at 6281 (Greene testifying that he brought his own handgun and an upper receiver for Landon Bentley).

As Rhodes finalized plans for January 6, he messaged co-conspirator Kellye SoRelle, "This will be DC rally number three.  Getting kinda old.  They don't give a shit how many show up and wave a sign, pray, or yell.  They won't fear us till we come with rifles in hand."  *See, e.g.*, Gov. Ex. 6749 (Msg. 1.S.737.2818) (introduced at the trial of *U.S. v. Rhodes, et al.*, Case No. 22-cr-15-APM).  Greene once again was keyed in on Rhodes' thinking: on January 4, Bentley messaged Greene to ask if he was still going to D.C., and Greene responded, "Yep[.]  This shit is gonna be big."

ii.  *January 6, 2021*

On January 6, at 1:25 p.m., Rhodes sent a message to the "DC OP: Jan 6 21" Signal group, stating, "Pence is doing nothing.  As I predicted."  Gov. Ex. 1500.4.  Shortly thereafter, Watkins ordered the members of "Line One"—including Sandra and Bennie Parker, Laura Steele, William Isaacs, and Connie Meggs—to "move!"  *Id.*  The Line One members then marched in a group down Pennsylvania Avenue toward the Capitol.

As the group began to march, Watkins made an announcement on the "Stop the Steal J6" channel on Zello: "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol . . . We have about 30-40 of us.  We are sticking together and sticking to the plan."  Gov. Ex. 1500.4.  About ten minutes later, she provided an update on the channel: "Y'all, we're one block away from the Capitol right now.  I'm probably gonna go silent when we get there, because I'm gonna be a little busy."  *Id.*

5

At this time, Greene was already en route to the Capitol himself.   Positioned within the restricted grounds by 1:35 p.m., Greene observed the degrading security situation unfolding around him.   Gov. Ex. 1500.4; 3/7/23PM Tr. at 6311-12, 6319-27.   He responded not by alerting his co-conspirators to stay away from the Capitol, but by defending those perpetrating the violence and by summoning them to the riot.   *Id.*   At 1:54 p.m. an individual inquired on Signal whether those storming the Capitol were "actually Patriots."   *Id.*   Greene responded, "there patriots."   *Id.* James, the leader of Line Two, responded, "Were coming to Capitol ETA 30 MIN."   *Id.*   By Greene's own admission (and as detailed in his phone records, Gov. Ex. 2425.1), he also spoke with James on the phone.   Greene understood that James was en route to the Capitol and acknowledged James would do nothing without Greene's orders.   3/7/23PM Tr. at 6323-27.   In fact, at 2:15 p.m., Greene summoned everyone else to the Capitol, messaging the "DC OP: Jan 6 21" Signal group: "The[y] have taken ground at the capital," and "We need to regroup any members who are not on mission."   *Id.*

Having summoned them to the riot at the Capitol, Greene and Rhodes eventually ordered both groups of Oath Keepers into the building.   In a huddle at the Capitol, Kelly Meggs told the members of Line One that they were "going to try and stop the vote count," *Id.* at 2879, referring to certification of the 2020 Presidential Election.   This huddle occurred around the same time that Kelly Meggs had a three-way call with Rhodes and Greene.   At 2:32 p.m., Kelly Meggs called Rhodes, who was already on the phone with Greene.   Phone records show Rhodes merged them into a three-way call that lasted 90 seconds before Meggs dropped off the call and Rhodes and Greene continued talking.   Gov. Exs. 1500.4; 2409.1.   Immediately thereafter, Kelly Meggs led Line One in a single line up the Capitol steps, each individual with their hands on shoulders of the person in front of them.   *Id.* at 2880; *see also* Gov. Ex. 135.V.1.

After breaching the Capitol, Line One spilt into two equal groups: one group moving toward the Senate chamber and another toward the House.   Prior to moving down the Senate hallway, Florida Oath Keeper William Isaacs yelled, "the fight's not over," and pointed down the hallway.   *Id.*   In the Senate hallway, the rioters—to include Oath Keepers Sandra Parker, Steele, and Isaacs—pushed forward against the outnumbered officers guarding the Senate chamber located just beyond them.   *Id.*   As members of the group followed Watkins down the hallways, Watkins yelled, "Push, push, push. Get in there. They can't hold us."   *Id.*   The rioters in the Senate Hallway were eventually repelled by law enforcement officers using chemical spray, and Isaacs, who was at the very front of the line of rioters, was hit in the face by the spray.   *Id.*

Meanwhile, the other half of the group pushed towards the House chamber, eventually stopping directly in front of then-Speaker of the House of Representatives Nancy Pelosi's Office. 02/23/2023PM Tr. at 3995-96; Gov. Ex. 1674.   This other group included Oath Keepers Kelly Meggs, Connie Meggs, and Caleb Berry, among others.   *Id.* at 3995.   At 7:09 p.m. on the evening of January 6, Kelly Meggs received a text message, "Was hoping to see Nancy's head rolling down the front steps."   Gov. Ex. 9553.1.   Kelly Meggs responded, "We looked forward her."   *Id.*

Approximately thirty minutes after Line One breached the Capitol, Greene had another phone call—this time, with James.   Immediately after that call, James led another group of co-conspirators ("Line Two") moved up the same steps and into the Capitol through the same doors and in the same formation as Line One, with their hands on each other's shoulders or backs.   Gov. Ex. 6740A; 1056.0933.0310.   Led by Joshua James, once inside, members of Line Two pushed against law enforcement while James screamed, "this is my fucking Capitol."   Gov. Ex. 1508.

Greene not only coordinated with Line One and Two before they entered the Capitol, but he also took credit for what was transpiring.   At 3:06 p.m., shortly before Line Two breached the

7

building, Greene positioned himself at the base of the steps Line One and Line Two ascended to breach the Capitol, took a photograph, and messaged an acquaintance, "Were storming the Capitol."   Gov. Exs. 1500.4, 2400.T.1.273.

Lines One and Two eventually departed the building.   The larger group of co-conspirators then gathered on the East Plaza of the Capitol.   Gov. Ex. 5306.   There, Greene and his co-conspirators gathered around Rhodes.   *Id.*

The conduct of the defendant, his co-conspirators, and the other rioters caused scores of law enforcement officers to suffer physical and emotional injuries; terrified congressional staff and others on scene that day, many of whom fled for their safety; and resulted in over a million dollars in damage to a historic and symbolic building.   Members of the House of Representatives and the Senate, including the President of the Senate, Vice President Michael R. Pence, were forced to evacuate their chambers, and the Joint Session was suspended.   The Joint Session was not able to resume until after 8:00 p.m. that evening, after the building was cleared and secured.   And the cost to our democracy and system of government was incalculable.   *See United States v. Gardner*, No. 21-cr-622 (Mar. 16, 2023), Sent. Tr. at 68 (identifying one of the "victims" on January 6 as "democracy itself").

### iii.   *Actions After January 6*

During their assault on the Capitol and in the immediate aftermath of January 6, the defendant and his co-conspirators celebrated and took credit for their actions that day.   On the evening of January 6, Greene, Rhodes, and others all celebrated their actions and the outcome of January 6 at a restaurant dinner.   Others bragged in messages.   Connie Meggs, for example, echoing her husband's directive to "stop the vote" after his call with Greene, recounted to a friend via text that she had "heard about mike pence being a faggot and everyone went to the capital to

stop the vote."   Gov. Ex. 9651 (Msg. Gov. Ex. 9651).

The defendant and his co-conspirators quickly learned, however, that law enforcement was investigating those who attacked the Capitol, and they took a variety of steps to obfuscate their involvement.   Rhodes instructed everyone to "DELETE ANY OF YOUR COMMENTS REGARDING WHO DID WHAT."   Gov. Ex. 9835 (Msg. 54.S.125.2878).   Greene complied. He deleted two of the most incriminating exchanges off his phone—the message in which he stated "Were storming the Capitol" and the exchange in which he called the rioters "patriots" and James informed him that he was "coming to Capitol."   2/27/23PM Tr. at 4579-82; 3/8/23AM Tr. at 6519-26.   As Greene explained to an acquaintance on January 7, "Not using much phone right now. Location – scissors emoji – and signal had been choppy.   Have to get it scrubbed."   Gov. Ex. 9836.

### B.  The Charges and Penalties

The Indictment charged the defendant and seven of his co-conspirators with conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count One); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Three); and entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Five).   ECF 684. For deleting certain incriminating evidence from his phone, Greene was additionally charged with tampering with documents or other objects, in violation of 18 U.S.C. § 1512(c)(1) (Count Nine). *Id.*

Greene was tried with five of his co-defendants in a several-week jury trial that occurred in February and March of 2023.   The jury returned its verdicts on March 20 and 21, 2023.   Greene

was convicted of Count Five, entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1).   The jury was unable to reach a verdict on Count Two, obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.   The Court declared a mistrial on that count and the government elected not to retry Greene.   The jury acquitted the defendant of the other charges.

The PSR correctly recounts the statutory penalty for the offense of conviction: for Count Five, entering or remaining in a restricted building or grounds, the maximum statutory penalty is one year of incarceration.

## II.   SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point" for determining a defendant's sentence.   *Id.*

### A.  Legal Standards

#### i.  Preponderance of the Evidence

To apply a provision of the Guidelines that the jury did not necessarily already find beyond a reasonable doubt by virtue of its guilty verdict, the Court must make a finding by a preponderance of the evidence.   *United States v. Watts*, 519 U.S. 148, 154 (1997); *see United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) ("[I]t is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted."); U.S.S.G. § 6A1.3, cmt.

The Court may consider any relevant information, without regard to whether the information would be admissible at trial.   18 U.S.C. § 3661.   The Court may also consider acquitted conduct, *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008), including

10

specifically an acquittal of a conspiracy charge, *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014). In other words, the court may find by a preponderance of the evidence that a defendant was a member of "the very conspiracy that the jury acquitted [him] of participating in," and then use that conduct to apply provisions of the Sentencing Guidelines to increase the defendant's sentence. *Id.* at 1369.

### ii.  Relevant Conduct and Definition of "Offense"

In applying the Guidelines, the Court must consider all "relevant conduct." And especially in a conspiracy case, "relevant conduct" is "broadly defined." *United States v. Khatallah*, 41 F.4th 608, 645 n.23 (D.C. Cir. 2022).

Under Section 1B1.3(a)(1)(A), a defendant's "relevant conduct" encompasses both the defendant's own acts and those that the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. And under Section 1B1.3(a)(1)(B), in a "jointly undertaken criminal activity," such as a conspiracy, a defendant is responsible for all acts of others that were "within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity." Finally, a defendant's "relevant conduct" under the Guidelines includes "all harm that resulted" from the defendant's acts or the acts of others engaged in the jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(3).

As laid out in greater detail in the background section above, the evidence at trial established by a preponderance of the evidence that the defendant participated in a conspiracy to obstruct an official proceeding and to use force, intimidation, or threats to prevent members of Congress from discharging their duties and to drive them from the place of their duties. Accordingly, he is responsible for actions of his conspirators that fall within the parameters of

Section 1B1.3(a)(1)(B).  It is true that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant."  U.S.S.G. § 1B1.3, cmt. n.3(B).  But given the nature of the conspiracies here, the defendant's "relevant conduct" supports application of each of the Guidelines provisions discussed below.  *See United States v. Khatallah*, 314 F. Supp. 3d 179, 189 (D.D.C. 2018) (broadly applying Section 1B1.3 because, in part, "'[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his co-conspirators'") (quoting *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980)).

Although Greene was acquitted of all the conspiracy counts, the Court can and should still find by a preponderance that his "relevant conduct" includes the actions of his co-conspirators. The defendant has previously pressed arguments similar to the ones made by the defense in *Khatallah*, 314 F. Supp. 3d at 188-89—that a court must give "true meaning" to an acquittal and provide the defendant with the benefit of subtracting parts of "relevant conduct" that a jury may or even must have rejected.  But Judge Cooper specifically rejected that contention: "the Court can find no support in the Guidelines or cases interpreting them for [the defense's] approach of systematically subtracting facts the jury 'necessarily rejected' from the scope of an offense of conviction for purposes of the Guidelines."  *Id.* at 189.  And the D.C. Circuit endorsed Judge Cooper's reasoning in affirming that the jury through its acquittal did not necessarily reject the facts underlying the sentencing enhancements at issue.  *Khatallah*, 41 F.4th at 648.  In other words, regardless of the jury's determination of whether a defendant was guilty or not guilty of conspiracy, the Court must consider, if proven by a preponderance of the evidence, the "relevant

conduct" for which the defendant is criminally responsible.

The Guidelines' definition of "offense" is, with exceptions not applicable here, "the offense of conviction *and all relevant conduct under § 1B1.3*."   U.S.S.G. § 1B1.1, n.1 (emphasis added). Therefore, in addition to determining the specific offenses for which the defendant was convicted, the Court must also determine the "relevant conduct" under Section 1B1.3 for which the defendant is criminally responsible under the Sentencing Guidelines.   In reaching this decision, the Court must look to the contours of the underlying scheme itself rather than the mere elements of the offense charged."   *United States v. Caballero*, 936 F.2d 1292, 1298-99 (D.C. Cir. 1991) (cleaned up).

The Court may consider a defendant's "role with respect to all crimes, charged or otherwise, 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'"   *Bapack*, 129 F.3d at 1326 (quoting U.S.S.G. § 1B1.3(a)(2)).   The "relevant conduct" constitutes "all crimes" that "were part of the same course of conduct or common scheme or plan."   Here, that "course of conduct" includes all of the actions and statements described in the background section above.

## B. Chapter Two: Offense Conduct

The PSR applies the appropriate Sentencing Guideline and specific offense characteristics, given the defendant's relevant conduct.

### i.   *Section 2J1.2 (Obstruction of Justice) as the Offense Guideline*

The PSR correctly determines that the appropriate Chapter Two offense guideline for Count Five is § 2B2.3, "Trespass," U.S.S.G. Appendix A; however, because the offense was committed with the intent to commit a felony, the Court should apply the guideline for that felony (and all applicable specific offense characteristics), U.S.S.G. §§ 2B2.3(c)(1), 2X1.1.   Here, as

13

discussed above, a preponderance of the evidence at trial established that Greene committed the offense of his conviction (Count Five, entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1)), with the intent to commit a felony, to wit: obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).   The applicable Chapter Two offense guideline for that offense is Section 2J1.2 (Obstruction of Justice).

ii.   *"Administration of Justice" Specific Offense Characteristics*

An eight-level increase under Section 2J1.2(b)(1)(B) applies if the offense involved causing or threatening property destruction or injury to others "in order to obstruct the administration of justice."   A separate three-level increase under Section 2J1.2(b)(2) applies "if the offense resulted in substantial interference with the administration of justice."

1.   Legal Applicability

The phrase "administration of justice," as used in these two specific offense characteristics, is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), including a "proceeding before the Congress" such as the certification of the Electoral College vote.   *United States v. Matthew Wood*, 21-cr-223 (Nov. 28, 2022), Sent. Tr. at 35-38.   Indeed, as this Court held in sentencing Greene's co-conspirators in the *Rhodes* matter, the eight-level increase under Section 2J1.2(b)(1)(B) and the three-level increase under Section 2J1.2(b)(2) both are applicable, as a matter of law, to the circumstances presented by this conspiracy.   *See, e.g.*, 5/24/23 Tr. at 168-77; 5/25/23AM Tr. at 3-8, 73-74.

2.   Section 2J1.2(b)(1)(B) (Causing or Threatening Injury or Damage)

This specific offense characteristic also applies because, as a matter of fact, the defendant's relevant conduct "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."   U.S.S.G. § 2J1.2(b)(1)(B).   As this

14

Court recently summarized at the *Rhodes* sentencings, "The essence of the . . . agreement represented a threat to others, including members of Congress."   5/25/23AM Tr. at 73.

*First*, the defendant's co-conspirators in Line One were part of a mob of rioters that caused injuries to Capitol Police officers guarding the doors to the building.   *See* 2/10/23AM Tr. at 1376 (testimony of Officer Marc Carrion that some "officers were being sprayed with OC spray, basically mace," and "other officers were being hit with flagpoles," "we had batteries thrown at us," and "officers were being injured and had to come off the line"); Gov. Ex. 1096.5 (video showing the mob's assault on Officer Carrion and other officers at the east Rotunda doors); Gov. Ex. 7077.1 (video showing co-conspirator Isaacs forcing his way through the East Rotunda Doors as other rioters attempt to remove the mask of a Capitol Police officer).   Indeed, the jury's verdict convicting Isaacs of interfering with Officer Carrion during Stack One's breach of the Capitol building, *see* No. 21-cr-28, ECF 910 at 6, shows that the co-conspirators' offense involved causing or threatening to cause physical injury to a person, because Isaacs' offense is part of the "relevant conduct" under Section 1B1.3.

*Second*, the conspirators, in breaching the Capitol building, were part of a mob of rioters that caused damage to the Capitol Building's East Rotunda doors and Columbus doors.   2/22/23 Tr. at 3537-53.   Indeed, the jury convicted co-conspirators Isaacs, Connie Meggs, Steele, and Sandra Parker of destruction of government property for their criminal culpability for the damage to the doors.   *See* No. 21-cr-28, ECF 910 at 5.   And again, these co-conspirators' actions are "relevant conduct" for this defendant under Section 1B1.3(a)(1)(B).

*Third*, the conspirators, including co-defendants Isaacs, Steele, and Sandra Parker, pushed against a line of riot officers from the Metropolitan Police Department ("MPD") in an effort to breach the Senate chamber to physically access the senators and staffers doing their jobs inside,

15

causing physical injury to those officers.   Officer Owens and Officer Jackson have both testified

to the physical injuries they and their fellow officers suffered during this encounter.   2/27/23AM

Tr. at 4346-79; *see also Rhodes, et al.*, 10/26/22AM Tr. at 5441 (Officer Owens: "When the lines

collided . . . the surge of us against the surge of the rioters coming at us lifted me up off my feet. .

. . I was just literally lifted up off the ground."); *id*. at 5453 ("My arms and legs were bruised and

bloodied and battered."); 1/6/23AM Tr. at 3384 ("So the biggest thing was like the weight of all

of them, like just pushing down on you. . . . And for a moment, I thought we were going to lose

this fight.").   Indeed, co-conspirators Watkins, Steele, Isaacs, and Sandra Parker have all been

convicted of violating 18 U.S.C. § 231 for interfering with law enforcement officers during this

incident.   Accordingly, a jury has concluded beyond a reasonable doubt that some members of

the conspiracy "caus[ed] or threaten[ed] to cause physical injury to a person . . . in order to obstruct

the administration of justice," U.S.S.G. § 2J1.2(b)(1)(B).

*Fourth*, some conspirators, including Minuta and James, assaulted and pushed against

MPD riot officers in the Rotunda in an effort to further penetrate into the Capitol building in search

of the legislators inside, causing physical injury to those officers.   *See Rhodes, et al.*, 1/6/23AM

Tr. at 3385 ("[T]he individuals in front of [MPD Officer Jose Mendoza] were trying to pull him

into the crowd with them. . . . I knew I had to grab him so that he was not taken away."); *id*. at

3401 ("[T]hey seemed like they were very violent, they were intent on making their way into the

Capitol by any means necessary, and I didn't want Officer Mendoza to be a victim in anything.").

*Fifth*, some conspirators, including Harrelson and Dolan, while breaching the building and

marching through the Rotunda, chanted "Treason!" regarding those Members of Congress who

were supposed to be inside the Capitol building performing their constitutional duties to meet to

certify the election results.   Gov. Ex. 1503.1.   Those chants were threatening and intimidating.

16

Indeed, in similar contexts related to the attack on the Capitol, other judges have applied this characteristic over a defendant's objection on the theory that a defendant's words and conduct were "threatening" even if the defendant did not "assault" an officer or staffer.   For instance, then-Chief Judge Howell held that while a defendant did not directly verbally threaten Capitol Police officers, his "physical movements . . . communicated threats to law enforcement."   *Rubenacker*, No. 21-cr-193, Sent. Tr. at 56.   "[The defendant's] pursuit of [an officer], in blatant disregard for this officer's instructions to stand back and leave, as the crowd of angry, yelling rioters swelled around him, constituted a clear and direct threat to the safety of [the officer] and could have led to [the officer's] physical injury."   *Id.* at 57.   "The defendant's yelling and taunting at the officers . . . in an agitated manner with his finger outstretched was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers."   *Id.* at 58.

*Sixth*, the conspirators, including Vallejo and Caldwell, managed an arsenal of firearms at a hotel in Virginia as part of an armed Quick Reaction Force to support the other conspirators on the ground at the Capitol building—a fact Vallejo made clear in his podcast comments on the morning of January 6.   Gov. Exs. 9750, 1500.4.   As discussed above, a preponderance of the evidence established that Greene was aware of these QRF plans.   The threat to use firearms to accomplish the conspirators' unlawful ends of halting the certification proceeding and stopping the transfer of presidential power was a "threat" to cause harm to a person or property within the meaning of Section 2J1.2(b)(1)(B), even if the threat was not communicated directly to the legislators or officers.   *See United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008) (in prosecution for interstate communications of threats, the "threat doesn't need to be communicated directly to its victim or specify when it will be carried out"); *United States v. Baker*, 514 F. Supp. 3d 1369,

1378 (N.D. Fla. 2021) ("[The] language of 18 U.S.C. § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce.") (quoting *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001)).   Indeed, Judge Friedrich relied on this theory to apply the eight-level enhancement under Section 2J1.2(b)(1)(B) for a defendant's threatening words about Speaker Pelosi and Senator McConnell that he uttered to others but not the legislators' themselves.   *See Reffitt*, No. 21-cr-32 (Aug. 1, 2022), Sent. Tr. at 20-21.

The defendant's "relevant conduct"—conduct that a preponderance of the evidence establishes Greene knew about and sanctioned—therefore "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," and thus, as the PSR finds, each is subject to the characteristic in Section 2J1.2(b)(1)(B).

3.  Section 2J1.2(b)(2) (Substantial Interference with Administration of Justice)

This specific offense characteristic applies because the defendant's relevant conduct, as a matter of fact, did "*result in* substantial interference with the administration of justice."   U.S.S.G. § 2J1.2(b)(2) (emphasis added).   As an initial matter, it is hard to imagine a more substantial interference with the administration of justice.   The defendant's relevant conduct resulted in the evacuation of an entire branch of the federal government and the suspension of a congressional proceeding that was required by the Constitution and federal statute to take place at a certain date, time, and location so that our country could peacefully transfer presidential power from one person to the next.   Indeed, as this Court recently observed at the *Rhodes* sentencings, "[T]he fact that the proceedings had to be adjourned and then were adjourned for a period of time constitutes substantial interference."   5/25/23AM Tr. at 75.

18

The Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*."   U.S.S.G. § 2J1.2, cmt. n.1 (emphasis added).

The events of January 6 indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from entities responsible for the United States Capitol [1] totaling approximately $2.9 million.   And the conspirators' offenses contributed to that "unnecessary expenditure" of substantial governmental resources: the deployment of hundreds of law enforcement officers to defend and then clear the Capitol building and grounds of those—such as the defendants here—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the certification proceedings.   The repair and clean-up costs were similarly extensive, and certainly "substantial."

The evidence established that the conduct of the conspirators in this case obstructed Congress' certification (delaying it by several hours, for example) and impeded the ability of the staff working for the Vice President (see the testimony of Secret Service Inspector Lanelle Hawa),

---

[1] Including the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   Additionally, as discussed in the government's Brief Regarding Restitution recently filed in *Rhodes*, see ECF No. 654 at 4 n. 3, the Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is a victim under the analysis set forth above. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million).

the Speaker of the House (see the testimony of Jamie Fleet), and the House Parliamentarian (see the testimony of Thomas Wickham), among others, to complete their work related to that certification.    That delay caused the unnecessary expenditure of substantial governmental resources.    Therefore, the three-level enhancement under Section 2J1.2(b)(2) applies.

      *iii.*     *"Extensive Scope, Planning, or Preparation" Specific Offense Characteristic*

Section 2J1.2(b)(3) provides a two-level enhancement if the offense (A) involved the destruction of a substantial number of records; (B) involved the selection of an especially probative record to destroy; or (C) "was otherwise extensive in scope, planning, or preparation."    While all three components of subsection (C) apply here, based on the subsection's use of the disjunctive "or," the Court need only find that the defendant's relevant conduct was extensive in scope, planning, *or* preparation.    *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016).

Here, the PSR correctly determines that the conspirators' relevant conduct was extensive in scope, planning, *and* preparation.    This Court in *Rhodes* recently applied the enhancement to the conspirators' crimes related to the attack on the Capitol.    See, e.g., 5/25/23AM Tr. at 76 ("Clearly there was extensive scope and planning for the events of January 6th. Even if we take the time period simply from December 19th forward, there's extensive scope and planning in terms of gathering people, making arrangements for transportation, hotel, bringing of weapons, and creating of groups to operate on that day.    And then, of course, planning and preparation in terms of going into the building was exhibited by the way in which people entered in groups—that is planning and preparation, and shows organization.").

Indeed, this conspiracy was extensive in both its objective and size.    A total of 22 individuals have been convicted for their roles in this conspiracy: Greene, his five co-defendants convicted in *United States v. Sandra Parker, et al.*, 21-cr-28, the nine defendants in *United States*

20

*v. Rhodes, et al.*, 22-cr-15, and the seven cooperating defendants.[2]   The conspiracy and its

attendant conduct was protracted, lasting from December 2020 through January 2021.   The

members of the conspiracy communicated with each other using sophisticated, encrypted

messaging applications, email servers, and meeting platforms.   They also coordinated with one

another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, Ohio,

Indiana, North Carolina, Virginia, and elsewhere into the D.C. area.   The presence of the armed

Quick Reaction Force staged miles from the Capitol building at a hotel in Virginia, armed with

firearms and other weapons collected from numerous persons, also shows the extensive scope of

the offense.   Finally, the scope of the conspiracy's objective was itself enormous: to forcibly

prevent an entire branch of the federal government from performing its constitutional and statutory

duties.

## C. Chapter Three: Adjustments

The PSR applies the appropriate adjustments, given the defendant's relevant conduct.

### i. Section 3B1.1 (Aggravating Role)

The Guidelines provide for an increase in the offense level if the defendant played an

aggravated role in the offense, as an "organizer" or "leader" (four levels) or "manager" or

"supervisor" (three levels) of a criminal activity that involved five or more participants.   U.S.S.G.

§ 3B1.1(a), (b).   The Court should consider the following non-exhaustive factors in determining

whether to apply the adjustment and, if so, whether to add three or four levels:

---

[2] All but two of these defendants were convicted of at least one conspiracy charge.   The
exceptions are Caldwell and Greene, who, as explained herein, were proven to be members of the
conspiracy by preponderance of the evidence.   There are also five additional members of the
conspiracy still pending trial (Kellye SoRelle, Donovan Crowl, James Beeks, Jonathan Walden,
and Jeremy Brown), not to mention the unindicted co-conspirators, including those who managed
the arsenals of weapons at the QRF hotel.

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1, cmt. n.4). "No single factor is dispositive." *Id.* While the court must examine the degree of "control" the defendant exercised over other criminally culpable individuals, *id.*, this factor "alone does not determine whether the sentence can be increased" pursuant to Section 3B1.1, *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994); *see also United States v. Brodie*, 524 F.3d 259, 270-71 (D.C. Cir. 2008) (noting the "several" factors that must be considered *in addition* to "control"). The Circuit has further explained that it understands "control" to "connote some sort of hierarchical relationship" among the participants in the criminal enterprise. *Olejiya*, 754 F.3d at 990.

Here, there *was* a hierarchical relationship among the participants in the conspiracy. At the top of the conspiracy were leaders and organizers like Rhodes, Meggs, and Watkins, who actively recruited and controlled many of the other participants who were involved. Lower-level leaders, like Greene, Minuta, and Vallejo, managed or supervised other co-conspirators in title and in action on January 6. While the government concurs with the observation by the authors of the PSR that "Michael Greene had an aggravating role in the offense," it acknowledges that the Court held in the related *Rhodes* matter that the adjustment did not apply to similarly situated co-conspirators Minuta, Hackett, and Vallejo.

### ii.  Section 3C1.1 (Obstruction of Justice)

The PSR correctly determines that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice to the defendant. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration

of justice with respect to the investigation, prosecution, or sentencing of the instant offense of

conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction

and any relevant conduct; or (B) a closely related offense."   U.S.S.G. § 3C1.1.

As described above, the defendants obstructed justice by deleting or destroying evidence

and by lying while testifying.   The commentary to the Guidelines includes a non-exhaustive list

of some of the ways that a defendant can obstruct justice.   *See, e.g.*, U.S.S.G. § 3C1.1, cmt. n.4(B)

(committing perjury); cmt. n. 4(D) (deleting evidence or instructing others to do so, or attempting

to do so); *see also United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury

merits the obstruction enhancement under Section 3C1.1); *United States v. Mellen*, 89 F. App'x

268, 270 (D.C. Cir. 2004) (affirming application of the enhancement for "advis[ing]" someone

else to destroy property to avoid detection, and then destroying the evidence himself).   "Where

conduct is directly and inherently obstructive—that is, where the defendant engages in behavior

that a rational person would expect to obstruct justice—the court may infer an intent to obstruct

justice and need not make a separate finding of specific intent."   *United States v. Reeves*, 586 F.3d

20, 23 (D.C. Cir. 2009) (citation and internal quotation marks omitted); *see also United States v.*

*Khan*, 461 F.3d 477, 500-01 (4th Cir. 2006) (noting the trial court's imposition of the adjustment

under Section 3C1.1 in a seditious conspiracy case where the defendant "gave false statements to

investigators and destroyed evidence before trial, in addition to providing 'incredible' testimony

at trial" and that "the Guidelines treat those who accept responsibility and those who obstruct

justice differently").

There are two primary bases for applying this adjustment to the defendant:

*First*, under Note 4(D), the defendant is culpable of "destroying or concealing or directing

or procuring another person to destroy or conceal evidence that is material to an official

investigation or judicial proceeding . . . or attempting to do so."[3]   A preponderance of the evidence at trial established that Greene deleted one incriminating message and one entire incriminating group chat from his phone.   *See* 2/27/23PM Tr. at 4579-4583; 3/8/23PM Tr. at 6519-6540; Gov. Exs. 9222.2, 9222.3, 9836, 9902, 10252.

*Second*, under Note 4(B), Greene provided false testimony either at trial or earlier court proceedings that "reflect[ed] a willful attempt to obstruct justice," U.S.S.G. § 3C1.1, cmts. n.2, 4(B).   The Court should find by a preponderance of the evidence that the defendant committed perjury.[4]   *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004).   A defendant committed perjury if he or she gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94.   A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination."   U.S.S.G. § 3C1.1, cmt. n.6; *see also United States v. Hines*, 694 F.3d 112, 122 (D.C. Cir. 2012) (affirming the imposition of the two-point adjustment for obstruction of justice based on the defendant's "deliberate[] misrepresent[ion]" during a pretrial suppression hearing regarding a one-day discrepancy in the date he was first interviewed by government agents).

---

[3] While a Section 1512(c)(1) *conviction* requires the obstruction of justice adjustment, a Section 1512(c)(1) *acquittal* has no impact on the adjustment, for two reasons.   *First*, as described above, the government bears a far lower burden at sentencing (preponderance of the evidence) than at trial (reasonable doubt).   *Second*, Section 1512(c)(1) requires that a defendant "corruptly" intend to obstruct an "official proceeding" (here, a grand jury investigation).   But a Section 3C1.1 adjustment requires that a defendant act with a different mental state ("willfully" rather than "corruptly") and with the intent merely to obstruct an "official investigation" (here, an FBI investigation) rather than an "official proceeding."

[4] Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

Greene continued to obstruct all the way through trial by falsely testifying under oath. Greene gave multiple stories about how the message in which he admitted, "Were storming the Capitol," came to be deleted from his phone, first asserting that his phone never saved the message because it was a Google Voice message, 3/7/23AM Tr. at 6134-36, and later admitting he intentionally deleted the message (which was a text message) but claiming he did so to avoid a new love interest from finding out about an old one, 3/7/23PM Tr. at 6365.   Greene also testified that he was not knowingly on the restricted area of the Capitol grounds, 3/7/23PM Tr. at 6320-21, 6347, but the jury's verdict necessarily found otherwise.

### iii.   Section 3E1.1 (Acceptance of Responsibility)

The PSR correctly rejects any claims to an entitlement to a reduction in offense level based on acceptance of responsibility.

Such an adjustment, the Guidelines commentary makes clear, "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."   U.S.S.G. § 3E1.1, cmt. n.2.   It will be "rare" for a defendant who proceeds to trial to receive this adjustment. *Id.*   That "rare" situation is when a defendant proceeds to trial to "preserve issues that do not relate to factual guilt."   *Id.*

The defendant contested that the government proved the necessary *mens rea* for the defendant to commit the conspiracy or obstruction of justice offenses.   The defendant, therefore, denied an essential factual element of guilt: his own intent.   Indeed, in a different Capitol riot case, Judge Walton rejected this precise argument, holding that a defendant who went to trial and testified about his conduct but denied possessing the necessary *mens rea* to corruptly obstruct the official proceeding would "absolutely" not be entitled to a reduction for acceptance of

responsibility.  *United States v. Thompson*, 21-cr-161 (Nov. 18, 2022), Sent. Tr. at 64.  Judge

Walton's conclusion echoes that of circuit courts, which routinely find that district judges do not

abuse their discretion or clearly err in denying the acceptance-of-responsibility adjustment for

defendants who proceed to trial in obstruction cases contesting whether they possessed the

requisite corrupt intent.  *See, e.g.¸ United States v. Marinello*, 839 F.3d 209, 226-27 (2d Cir.

2016), *reversed and remanded on other grounds*, 138 S. Ct. 1101 (2018); *United States v. Petruk*,

836 F.3d 974, 977-78 (8th Cir. 2016).   A defendant who admits his physical actions but denies

his intent necessarily denies his "factual guilt" under Section 3E1.1.  *See United States v. Jaynes*,

75 F.3d 1493 (10th Cir. 1996) (affirming inapplicability of this adjustment for defendant who

admitted conduct constituting forgeries but denied any intent to defraud government); *United

States v. Burns*, 781 F.3d 688 (4th Cir. 2015) (affirming inapplicability of this adjustment for

defendant who admitted to shooting into car but denied possessing intent to kill).

Indeed, even in his PSR interview, the defendant continued to deny his responsibility for

the role he played on January 6.

### iv.  *Applicable Sentencing Guidelines Range*

Based on the analysis above, the following guidelines, specific offense characteristics, and

adjustments should apply to Defendant Greene:

***Count Five* (Entering or Remaining, Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1))**

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2J1.2(a) (applying §§ 2B2.3(c)(1), 2X1.1) |
| Specific Offense Characteristic | +8 | §2J1.2(b)(1)(B) (physical injury or property damage) |
| Specific Offense Characteristic | +3 | §2J1.2(b)(2) (substantial interference due administration of justice) |
| Specific Offense Characteristic | +2 | §2J1.2(b)(3)(C) (extensive in scope, planning, or preparation) |
| Adjustment | +2 | §3C1.1 (obstruction of justice) |
| Total | 29 | |

The defendant has no known criminal history, so he is a Criminal History Category I.   Applying all of these factors, the defendant's recommended sentencing guidelines range is 87-108 months of incarceration; of course, the statutory maximum sentence for the offense is 12 months of incarceration, so that is the recommended sentence under the Guidelines.

## III.   SECTION 3553(a) FACTORS

The Court's sentence must be guided by the factors in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate general and specific deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). These factors all show that a sentence of 12 months of incarceration is appropriate and necessary in this case.

### A.   Nature and Circumstances of the Offense and Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The defendant played a leadership role in an unprecedented conspiracy to stop members of Congress from performing their constitutionally required duty to review and certify the results of the 2020 presidential election.   As the Court noted after the verdict in the related *Rhodes* matter, the seriousness of this offense cannot be overstated.   1/23/23 Tr. at 4769.   "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   The attack was calculated to interfere with, and did interfere with, one of the most important democratic processes we have: the peaceful transfer of power.   As noted by Judge Moss during a different sentencing hearing,

27

> [D]emocracy requires the cooperation of the governed.   When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at. 69-70.   Indeed, as this Court sadly observed in sentencing co-conspirator Rhodes, one of the "enduring legacies of January 6" is that "we all now hold our collective breaths every time an election is approaching."

On January 6, Greene set into motion the Oath Keepers' participation in this devastating attack on our democracy.   He must receive a significant sentence of incarceration to reflect his role in this grave offense.

In addition to attacking our democracy itself, the conduct of the defendant and his co-conspirators harmed institutions and individuals alike: the government, Congress, legislators, the staffers working inside the Capitol building, and the hundreds of law enforcement officers from across the region valiantly trying to protect the building, the people, and the constitutional process. The chilling victim impact statements presented to the Court in the related *Rhodes* matter convey the monumental impact of the defendant's offense.   *See* 22-cr-15, 5/24/23 Tr. at 1-32.

Opposing the transfer of presidential power and invading the U.S. Capitol building and grounds also constituted an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5]   As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration.

---

[5] FBI Director Christopher Wray, Statement before House Oversight and Reform Committee (June 15, 2021), *available a*t oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray %20Testimony. pdf

### B.  Need for the Sentence to Afford Adequate General Deterrence

Indeed, a significant sentence is needed "to afford adequate deterrence to criminal conduct" by Greene and others.   18 U.S.C. § 3553(a)(2)(B).   Here, the need to deter others is especially strong because this defendant and his co-conspirators engaged in acts that were intended to influence the government through intimidation or coercion.   And they were leaders of such efforts.   Because the defendant not only contributed to the attack on the Capitol but helped to organize and lead it, his sentence will be noted by those who would foment such political violence in the future.

### C.  Need to Avoid Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—a sentence of one year of incarceration is the only fair sentence, in light of the defendant's role in this conspiracy and the sentences recently imposed by the Court on some of the defendant's co-conspirators.

The defendant and his co-conspirators stand out among January 6 defendants because they not only joined in this horrific attack on our democracy as it unfolded, but they all took steps, *in advance* of January 6, to call for and prepare for such an attack.   From participating in chats and meetings in which they advocated for the use of force to stop the certification of the election, to transporting weapons across the country to stage around our nation's capital in support of this objective, these defendants intentionally helped to set the stage for January 6.

Thus, other January 6 cases are simply not comparable to the scope and magnitude of the conspiracy that constitutes the relevant conduct for this case.   Rather, this Court should be mindful of the sentences it recently imposed sentence on the eight co-conspirators in the related *Rhodes* matter.   The following chart lists each defendant's name and the sentence imposed by this Court.

| Defendant | Sentence Imposed in years (and months) |
|-----------|-----------------------------------------|
| Rhodes | 18 (216) |
| Meggs | 12 (144) |
| Harrelson | 4 (48) |
| Watkins | 8.5 (102) |
| Minuta | 4.5 (54) |
| Vallejo | 3 (36) |
| Hackett | 3.5 (42) |
| Moerschel | 3 (36) |

To avoid unwarranted disparities with his co-conspirators, under Section 3553(a)(6), Greene should be sentenced to the statutory maximum one year of incarceration.   On January 6, it was Greene who was the first member of the conspiracy to breach the restricted area of the Capitol; it was *Greene* who alerted *Rhodes* when the riot began; and it was Greene who summoned co-conspirators to the Capitol grounds.   Greene was the operations leader.   He was aware of the hierarchical structure of the Oath Keepers and knew that others would follow his commands.   And then he claimed responsibility, sending photographs he took of the riot with messages like, "Were storming the Capitol."   It would be unjust for someone like Greene, who played such a significant

leadership role for in this conspiracy on January 6, to serve less than one year in prison when co-conspirators like Vallejo and Moerschel will serve three.

## IV.    OTHER SENTENCING CONDITIONS

### A. Restitution

The government respectfully requests that the Court order the defendant to pay $500 in restitution to the Architect of the Capitol.

The defendant's conduct on January 6 affected several entities responsible for the Capitol building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, the Office of the Secretary of the United States Senate, the Senate Sergeant at Arms, and the United States Capitol Police.   In the related *Rhodes* matter, the government recently filed a brief outlining its factual and legal justification for the apportionment of restitution it has sought in January 6-related cases.   *See* Case No. 22-cr-15, ECF No. 654.   The government hereby incorporates by reference the facts and arguments in that pleading and submits on that record to justify its restitution request for Defendant Greene.   Should the Court directed the defendant to pay $500 as an approximate estimate of the losses for which he is responsible, his restitution payment should be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

### B. Supervised Release

The offense of conviction is a Class A misdemeanor.   18 U.S.C. § 3559(a)(6).   The Court should therefore sentence the defendant to term of supervised release of one year.   18 U.S.C. § 3583(b)(3).

### C. Special Conditions

The Probation Office recommends that the Court impose several special conditions on the

defendants during their terms of supervised release, including "Contact Restriction," "Social Media Restriction," "Propaganda Restriction," "Computer Monitoring/Search," and "Telecommunications."

The Court may impose, as part of supervised release, "any . . . condition it considers to be appropriate." 18 U.S.C. § 3583(d). Such a special condition may include "a discretionary condition" typically associated with probation under Section 3563(b). *Id.* It may also include "any other condition," so long as the condition satisfies the following three factors: (1) it "is reasonably related to" the Section 3553(a) sentencing factors, (2) it "involves no greater deprivation of liberty than is reasonably necessary" for achieving the Section 3553(a) sentencing factors, and (3) it "is consistent with any pertinent policy statements issued by the Sentencing Commission." *Id.*

The Court has "wide discretion when imposing terms and conditions of supervised release." *United States v. Hunt*, 843 F.3d 1022, 1030 (D.C. Cir. 2016) (quoting *United States v. Sullivan*, 451 F.3d 884, 895 (D.C. Cir. 2006)). And "[s]eparating a convicted felon from negative influences in his prior life is reasonably related to the permissible goals of deterrence and rehabilitation and is a common purpose of supervised release." *Id.* at 1031 (quoting *United States v. Watson*, 582 F.3d 974, 983 (9th Cir. 2009)).

Courts have imposed similar restrictions on defendants convicted of terrorism crimes, including restrictions on association and extremist content. *See, e.g., United States v. Rakhmatov*, No. 21-151, 2022 WL 16984536, at *3 (2d Cir. Nov. 17, 2022) (per curiam) (affirming conditions limiting association with terrorist enterprises and accessing content from "radical extremist group[s]"); *United States v. Doe*, 323 F. Supp. 3d 368, 390, 392 (E.D.N.Y. 2018) (after noting the "lack of data on terrorist recidivism rates," imposing special conditions that defendant (a) not

"associate with any individuals involved in any radical extremist groups," or (b) "access any website affiliated with any radical extremist group").   Indeed, in sentencing another defendant who was part of a militia group for his role in the attack on the Capitol, Judge Friedrich imposed the following condition:   "You must not associate, communicate, or otherwise interact, directly or indirectly, with any extremist militia group or member of such a group, including but not limited to the Texas Three Percenters, the Oath Keepers, and the Texas Freedom Force."   *Reffitt*, No. 21-cr-32, Sent. Tr. at 143.

Here, restricting the defendant's association and communication with other extremists and content published by other extremists furthers the goals of deterring and rehabilitating the defendant as he transitions back into the general population following his period of incarceration.

## V.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of one year of imprisonment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:            /s/
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Troy A. Edwards, Jr.
Alexandra S. Hughes
Jeffrey S. Nestler
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530