UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Case No. 21-cr-00028 |
| ) | |
| **MICHAEL GREENE** ) | |
| ) | |
| Defendant ) | |
| ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

The Government's Sentencing Memorandum persists in the fantasy it constructed about Mr. Greene that was rejected by the Jury after hearing not just the Government's case-in-chief, but Mr. Greene's testimony as well.

Yes – Mr. Green was the "Operations Leader" for the Oath Keeper's on January 6.

The evidence at trial showed that as related to Mr. Greene, the "operations" were the personal security details for Roger Stone, Ali Alexander, and unnamed Florida elected officials who were supposed by to be escorted by the Oath Keepers' Florida chapter, and security for the protest speech locations on January 5 and January 6, 2021.

The Government Memorandum persists in using provocative and disingenuous "loaded" language such as the claim that Mr. Greene was the "first member of the group to <u>breach</u> the restricted area of the Capitol grounds."

Yes, Mr. Greene was the first person affiliated with the Oath Keepers – not as a member but as a paid contractor – to step off the sidewalk and onto the grass at the Capitol park after the crowd had dismantled the "barriers," i.e., plastic snow fencing with signage communicating the message that the public should go no further.

Such grandiose phrasing reflects a continued refusal by the Government to respect the fact that the jury rejected its theory of the case with respect to Mr. Greene.

In addition, the Government continues to proffer its own interpretation of messages used as exhibits when those messages were the subject of testimony

that contradicted the Government's interpretation – the jury's verdict reflects that the government's interpretation did not carry the day.

Yes, Mr. Greene sent a message about Oath Keeper members "not on mission" coming to the Capitol.  Mr. Greene's testified as to the purpose and meaning of that message.  He knew from his observations that he had with him an insufficient number of Oath Keepers to provide site security as promised to the planned and permitted locations for protest speeches to be given later in the afternoon on January 6 at locations near the Capitol.  He testified that "not on mission" was a military phrase – addressed to many ex-military members – telling anyone no longer involved in the security details to which they were assigned – their "mission" -- to come to the Capitol to assist him.

There was NO evidence – testimony or otherwise – that Mr. Greene's communication was part of any advance planning for the entry into the Capitol later undertaken by either the first or second group of Oath Keepers who did so.  That is supposition advanced by the Government in the fact of a lack of actual evidence on the subject.

In fact, Joshua James told the Government in more than one interview that he had only one communication from Mr. Greene after the Roger Stone security detail ended – a call telling James and his Stone security detail to come to the Capitol.  James told the Government that he received no other message from Greene after that one communication; no reason was given for why the Stone group was to come to the Capitol; and no directions were given by Greene – or anyone else – to James' group for what they should do once they arrived at the Capitol.  James told the Government that the decision to lead the

second group into the Capitol just after 3:10 pm was made by James – and James alone. He told the Government that he had no further communications with Mr. Greene on any subject until seeing him in person after exiting the Capitol, and he was never told by Mr. Greene to enter the Capitol building.

Regarding the 3:08 p.m. call referred to by the Government on Page 3, James told the Government that any further efforts to communicate by telephone were made impossible by technical failures or simply because the background noise was too loud to be understood. Mr. Greene's testimony was the same, and this was confirmed by testimony of FBI Agents that technical difficulties with cell phone connections persisted throughout the afternoon on January 6 because of the size of the crowd and the demand on the cellular network.

Yet none of what James said to the FBI is reflected in the Government's Memorandum, nor was James ever called as a witness to offer his testimony.

Instead, the Government simply INVENTS substance for the 3:08 telephone call that both participants in the call deny occurred, and returns to grandiose and delusional characterization of the events in the form of "James led a second wave of five battle clad Oath Keepers up the same steps, through the same doors, and into the Capitol."

It's the kind of expositional writing that would make authors of historical fiction proud.

With regard to many of the Oath Keeper defendants the Government relied on Signal/text communications and/or social media comments to infer

an intention on their part to knowingly join the charged conspiracies, and/or participate in an effort to obstruct the congressional proceedings.

The Government had no such evidence for Mr. Greene, and it had no meaningful response to Mr. Greene's testimony that he had no interest in politics, the politics of the Oath Keepers, the controversy surrounding the outcome of the 2020 election, or who was going to be President on January 20, 2021.  He didn't vote.

Mr. Greene's testimony was consistent across two trials – he worked for the Oath Keepers because he got paid to do so and for no other reason.  His background and expertise involved personal and site security operations, and he provided that expertise to the Oath Keepers at Stewart Rhodes' request for an agreed upon price.  He had no other motive and no other purpose or intent connected to his involvement.  Claims by the Government to the contrary were rejected by the Jury and should be rejected by this Court.

The Government is forced to mischaracterize a single message from Mr. Greene on November 25, 2020, as a basis to support its continuing fact-free allegation that Mr. Greene possessed political views similar to Mr. Rhodes about the outcome of the election – hyperbolically claiming Mr. Greene shared Mr. Rhodes outlandish views:

> "Stewart believes were on the brink of a Civil War," and stated, "I can see how it would happen," as "a lot of people are upset about this election."

It borders on comical that the Government attempts to convert a communication to a third party of Rhodes' beliefs and an "observation" about how what Rhodes believes MIGHT happen in the future, into some form of endorsement or sharing in the same views.  There is a cavernous gulf between

what Mr. Greene wrote and the interpretation given by the Government to what Mr. Greene wrote.

A lack of actual evidence sometimes makes that necessary. When that's all a prosecutor has, that's what a prosecutor runs with.

The Memorandum's reference to the QRF is similar. Greene testified that when he took over the operation for Don Seikerman, he gave instructions to eliminate the QRF because it would be impossible to get any such group into DC on January 6 given what he witnessed when he attended the Trump rallies in November and December. He was derisive in his description of the viability of a QRF as planned by Rhodes and others, and explained to the jury in his testimony that what the Government described as a QRF wasn't really a QRF as the Oath Keepers were planning based on common military vernacular.

Having been a member of dozens of actual QFR's in combat situations, Mr. Greene pointed out the errors in the Government's analysis of what the Oath Keepers were planning. What the Government was describing as the QRF would actually have been an "Assualt Team," and no one in the Oath Keepers ever discussed having an "Assault Team" on January 6.

What the Oath Keepers were planning as a QRF was a factual impossibility given the realities of the situation, and that's why Mr. Greene instructed that the QRF be eliminated from the planning. But that instruction was either not received or was disregarded by Oath Keepers already traveling to D.C. when Mr. Greene took over the planning.

This Reply could go on for dozens of pages pointing out how and why the Government's use of its closing argument as a Sentencing Memorandum serves

no relevant function here. Sentencing turns on the outcome of the case, not the outcome of the case as the Government wishes it had been.

The jury acquitted Mr. Greene of the conspiracies the Government now insists should be the central basis for his sentencing. But you wouldn't know that from the Government's Sentencing Memorandum, which is filled with references to Mr. Green and "his co-conspirators." A conspiracy conviction requires a finding that a defendant intentionally entered into the conspiratorial agreement knowing of the criminal objective. The jury didn't find that to be the case, and the totality of the evidence is such that the Court should not find that to be the case either.

The questionable practice of considering acquitted conduct at sentencing has recently become relevant in this case. The Government cites United States v. Khatallah, 314 F.Supp. 3d 179, 189 (D.D.C 2018) as support for its argument that this Court should consider co-conspirator conduct as "relevant conduct" even where a defendant was acquitted at trial on the conspiracy from which the conduct is derived.

There is no question that Judge Cooper came to that conclusion, citing United States v. Watts, 519 U.S. 148, 154-55 (1997) as his basis for doing so. But neither Khatallah nor Watts require a sentencing court to include such co-conspirator conduct as relevant conduct at sentencing.

The Court's language in Watts confirms this to be the case: "[W]e are convinced that a sentencing court may consider conduct of which a defendant has been acquitted." Id. at 154. "We therefore hold that a jury's verdict of

acquittal <u>does not prevent</u> the sentencing court from considering conduct underlying the acquitted charge…." <u>Id</u>. at 156.

But this Court must now exercise caution in how and to what extent it follows Khatallah in making use of acquitted conduct at sentencing. As noted in Mr. Greene's Sentencing Statement, the comments by four Supreme Court Justices in <u>McClinton v. United States</u> at the end of the Court's most recent terms calls into question the continued vitality of <u>Watts</u> and what the Justices called the "controversial" practice of disregarding the jury's verdict in using "acquitted conduct" at sentencing. This Court is not required to use the acquitted conduct in the manner urged by the Government, and it is possible that doing so might be reversible error in the not-to-distant-future.

<u>Guideline Calculations</u>

Both parties agree that the applicable Guideline provision for Mr. Greene's conviction on an "A" misdemeanor is Sec. 2B2.3 – "Trespass." The base offense level is 4.

The Government then endorses the Probation Officer's invocation of the cross-reference in Sec. 2B2.3(c)(1) based on a <u>conclusory</u> statement that Mr. Greene "intended" to commit the felony of "corruptly obstructing an official proceeding" as part of his trespass. On that basis the Government claims that the appropriate Sentencing Guideline is Sec. 2J1.2 – "Obstruction of Justice."

So now the Government has sought "relevant conduct" on the basis of conspiracies for which the Jury acquitted Mr. Greene. To justify application of a cross-reference the Government relies on a substantive felony about which

the Jury could not reach a verdict and the Government opted to not seek to retry.

It's almost like the outcome of a jury trial in the form of the jury's verdict has no meaning at all in the eyes of the Government.

Without offering a factual basis for why it should be accepted that Mr. Greene "intended" to commit the felony offense of "corruptly obstructing an official proceeding", the Government's Memorandum jumps directly to the Sentencing Enhancements under Sec. 2J2.1. In fact, as noted at trial, there was no evidence offered by the Government that Mr. Green knew that a Congressional certification of the electoral college vote was taking place inside the Capitol at the time he was watching events while standing outside the Capitol.  He never went inside, he never posted on social media about the election certification, and he never made statements to anyone about wanting to interfere with any congressional proceedings on January 6.  There was also no evidence of "otherwise unlawful means" that might have been employed by Mr. Greene to show his "corrupt" intent in that regard.

On that basis, Mr. Greene objects to the use of the cross-reference to apply Guideline Sec. 2J2.1 based on the unsupported claim that he "intended" to commit some other felony, as well as enhancements provided under that Guideline.

Mr. Greene is aware of the Court's previous rulings with regard to the application of Sections 2J1.2(b)(1)(B) and (b)(2).  My Greene includes by this reference the same objections to the applications of these enhancements as made by the defendants in U.S. v. Rhodes, 22-cr-00015 APM, including the

the argument that "official proceedings" as used in 18 U.S.C. Sec. 1512(c) does not fall within the definition of the phrase "administration of justice" as used in Guideline Sec. 2J1.2, as well as all other grounds raised by those defendants on this point.

Obstruction of Justice.

It is certainly understandable that the prosecution would seek an obstruction of justice enhancement under the Guidelines any time a defendant such as Mr. Greene testifies at trial and is acquitted – especially when he is acquitted of all the most serious charges he is facing.

How could it not be "obstruction" by perjury for a defendant to take the stand and give testimony that leads to such acquittals?

The mindset of a prosecutor is that every defendant is guilty of every count because no prosecutor integrity would bring charges without him/herself being convinced beyond a reasonable doubt of the defendant's guilt.  It is only through gamesmanship or obstructionist behavior through false testimony that an obviously guilty person – in the eyes of the prosecutor – can convince a jury otherwise.

Absent a complete acquittal on all charges, a defendant must be held to account for his false testimony that led to this kind of unjust outcome.  Hence the claim by the Government that Mr. Greene testified falsely at trial and thereby gaining an acquittal/mistrial on all felony charges against him.

The Court heard hours of testimony from Mr. Greene – not once, but twice.  Mr. Greene's "unconventional" manner of testifying, under both direct and cross-examination, was blunt and plainspoken – to say the least.

It is very likely that parts of his testimony were responsible not only for his acquittal on the most serious charges against him, but also for the acquittal of other defendants on serious charges.

The nature and character of Mr. Greene's testimony were obvious to the Court, and he does not feel the need to defend his truthfulness against attacks from a Government that will never believe or accept his version of events under any circumstances as that would be an acknowledgement of egregious error by the Government.

With regard to the deleted message and the deleted Signal chat, for this to be "obstructionist" conduct under the Guidelines, Application Note 1 to Section 3C1.1 requires:

> "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if <u>the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction</u>."

With regard to the single text message "Were storming the Capitol", testimony of Agent Palian showed that the text messages obtained from Mr. Greene's cell phone provider – not from his phone itself – showed very limited text messaging during the relevant time period between 3:00 and 3:10 pm.

- 3:06:02: "Were storming the Capitol" – sent to young woman by mistake. No other messages to/from her that day.
- 3:06:07: Five seconds after above, message to Greene "I see they are trying to get into chambers." Text sent to him.
- 3:08: "There in" responding to that person. Oath Keepers never tried to get into chambers. Greene's text is what he's hearing in the crowd.
- 3:08: "Fucked up Nancy office." To same person. Oath Keepers didn't go into Speaker Pelosi's Office.
- 3:09: "Congress evacuated." To same person. Happened before Oath Keepers entered. More crowd info.

Mr. Greene was engaged in a string of text messages going back and forth with "Tel.No. 1" in which he was commenting on the events he was observing while on the West side of the Capitol. The other individual at "Tel.No.1" was watching events on television.

The message at issue came from "Tel.No.2" – "Were storming the Capitol" and it is the ONLY message to or from "Tel.No.2" during the entire day. The text message to Tel.No. 2 is not in response to any text message from Tel.No.2, and there is no text message from Tel.No.2 in response to the message at issue. Agent Palian admitted there were no other text messages, and no evidence of telephone calls, between Mr. Greene's phone and Tel.No.2 at any relevant time on January 6. The sole message at issue is a "one-off" text that appeared in the middle of a string of text messages back and forth to Tel.No.1.

Mr. Greene testified that he recognized Tel.No.2 when it was showed to him, and he recognized it as the number of a young woman he was in

communication with during that period – a young woman other than his live-in girlfriend who is the mother of his child. Agent Palian was asked if the FBI ever made any effort to interview the person at Tel.No.2 or otherwise identify her – they had not made any such effort.

Mr. Greene testified that he didn't delete the message at issue, he deleted the entire text chat between him and young woman at Tel.No.2. He did so not because of the message as issue – he wasn't even cognizant the message was there – he did so because he did not want his girlfriend to find the text chat with the other young women.

With regard to his deleting the Signal Chat "Jan 5/6 DC OP Intel Team" from his phone, the lack of intent to obstruct any investigation is evidenced by the fact that FBI Agent Abrams testified that based on her examination of the entire Cellubrite report of that Signal chat -- on the stand in front of the jury -- there was only a single solitary message from Mr. Greene on this particular Signal chat final message.

That was contrasted with the fact that when Mr. Greene voluntarily delivered his cell phone to FBI Agent Palian, still on the phone was the Signal chat titled "DC OP Jan 6 21," with more than 1350 messages total, including more than 900 messages between January 2 and January 6.

Mr. Greene didn't even recall deleting the "Jan 5/6 DC OP Intel Team" chat. There is no evidence to support the claim that he deleted that particular chat with the "purposeful calculation" to "thwart the investigation" while, at the same time, keeping on his phone the actual Signal chat used by dozens of individuals before, during, and after the Jan. 6 event.

CONCLUSION

It is understandable after the time and effort that was committed to this investigation by the Department of Justice and FBI that to have Mr. Greene not be convicted of any of the felony charges against him – when the Government has so stridently claimed Mr. Greene was the "operational leader" of the Oath Keeper's effort to prevent the peaceful transfer of power – is a proverbial "black eye" in the final analysis of what was accomplished. It is likely that Mr. Greene's testimony in two different trials was a significant contributing factor to many of the "not guilty" verdicts in those two trials. It is worth noting that in the only trial Mr. Greene did not testify in, all defendants were convicted on the most serious charges against them.

Mr. Greene stands convicted of a misdemeanor – nothing more. He has no prior criminal history, has served his country honorably, and has been a valuable and contributing member of his community and to his family. He came to Washington DC with the Oath Keepers to perform a job – work for which he was paid. The work was intended to be the same type of work he performed for the Oath Keepers on prior occasions. It might have been a job that the Department of Justice and FBI disapprove of, but it was a job nonetheless.

There is no justification for any term of imprisonment for – as Mr. Greene testified – remaining outside the Capitol and taking pictures of a spectacle not likely to ever happen again in his lifetime.

Date: July 18, 2023                                  Respectfully Submitted,

/s/ William L. Shipley
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*
